No. 741

First Circuit

CHIASSON v. CLEMENT ET AL.

(January 26, 1931. Opinion and Decree.)

C. A. Morvant, of Thibodaux, attorney for plaintiff, appellee.

Harvey Peltier, of Thibodaux, attorney for defendants, appellants.

MOUTON, J. In this case, which presents only issues of fact, the trial court rendered judgment for the amount claimed by plaintiff for the following reasons:

"This is a suit, to recover under a verbal contract.

"The contract contemplated the demolition of an old, and the erection of a new residence, for the sum of Six Hundred and Sixty Dollars.

"The sole dispute is whether or not the plaintiff did or did not undertake to furnish such new lumber and hardware as might be needed, after utilizing the material in the old building which belonged to the defendants—it being established that the cost of the new material was two hundred and sixty odd dollars.

"The new material was charged to the defendants' agent, at the direction of the plaintiff, and a lien was recorded against the completed building, therefor.

"The defendants paid four hundred dollars of the contract price and notified plaintiff that they would only pay the balance, when he should have paid for the new lumber and hardware in question.

"The plaintiff alleged and testified that he had undertaken to demolish the old, and to erect the new building, and to paint and paper it, all for the price of six hundred and sixty dollars. The defendants allege that plaintiff's contract obligated him to furnish everything for the contract price, $660.00.

"Henry Bergeron, the father of one of the defendants, testified that he made the bargain with plaintiff, and that plaintiff was to furnish everything. He insists that, by 'everything' the parties meant to include any new material that should be needed in addition to that which might be utilized from the old building, except plumbing which he says was not mentioned.

"Mrs. Bergeron, his wife, who says that she heard a part of the final agreement with plaintiff, corroborates her husband's version. And both aver that they felt able to pay only a limited amount (Bergeron was, it seems, acting in behalf of his

daughter and her husband), and that they would not have undertaken the erection of a new building, had they not understood that the price, $660.00, covered 'everything' except the plumbing which it seems that they had already ordered from Sears-Roebuck. However, it does not satisfactorily appear that 'plumbing' was ever mentioned in their negotiations, or that there was any specific exemption of it as an expense that was to be assumed by the plaintiff under the heading of 'everything.' Apparently, they did not view it as constituting a feature of a 'completed new structure,' but rather as an added convenience which they, themselves, chose to install.

"They both admit that, without protest, they paid for new gutters and for their installation—though the old building was admittedly equipped with gutters and, presumably, the new one should be similarly equipped. Though the furnishing of gutters for the new building would apparently have come within defendants' interpretation of the term 'everything,' Mr. Bergeron explains his failure to insist that plaintiff bear the cost and installation thereof, by saying that it was 'a small matter and that he chose to pay it, rather than to 'make a point' of it with plaintiff. Ordinarily, 'everything' would be held to have included gutters on such a building under the contract as testified to by Mr. Bergeron, as well as the new lumber and door-locks and hinger now insisted upon.

"As usual in disputes over the real terms of verbal contracts between laymen, the parties are hopelessly at variance as to the exact agreed stipulations—otherwise, litigation would probably not have been resorted to.

"As against the version of Mr. Bergeron and his wife, the plaintiff testifies that, aside from the actual work which necessarily includes laborers employed, he only undertook to furnish the paint and paper, for which he had a specific bid from a third person, $260.00. To this he added $400.00 to cover his own time and the needed labor. In other words, the painting and papering was to cost $260, to go to the third person, while he, himself, was to get four hundred dollars—of which facts, he says he informed Mr. Bergeron.

"He also testifies that Mr. Bergeron first wanted a larger building, including a new roof, which he, the plaintiff, offered to undertake, including papering and painting, for eight hundred dollars—at the same time telling Mr. Bergeron that the roof and new lumber would cost him, Bergeron, about $360.00.

"That Mr. Bergeron then sought an estimate on a smaller building, without a new roof; and that he reduced his estimate, or offer, to the extent of $140.

"That sixty dollars of this reduction was on account of labor, fifty dollars because of the smaller quantity of paper and paint that would be needed on the smaller structure, and that he made a further voluntary reduction of thirty dollars from his bid 'in order to be cheap.' He further testified that the elimination of 'a new roof' reduced the estimate for 'new lumber' about $140.00, and that this (the lessened cost of 'new lumber') was one reason why Mr. Bergeron abandoned his plan for a 'new roof.'

"It thus appears that plaintiff's understanding was that he was to receive for himself the sum of four hundred dollars, to which was to be added the $260.00 for painting and papering, which was the amount to be received by the 'third person' who undertook it for that figure—making a total of $660.00 to be paid to him by the defendants, and that the defendants were to supply the new materials needed—(first estimated at $360.00, but reduced by the amount of $140 because of the elimination of a 'new roof' and the acceptance of a smaller building), finally estimated at about $220.00. Thus making the total cost of the completed building to the defendants, about $880, instead of the $1,160.00, which the building as first discussed would have cost them.

"That plaintiff apparently did so understand his agreement with Mr. Bergeron, is indicated by the admitted fact that he did ask Bergeron where he should get the materials. Ordinarily, if he were bound to supply the materials, it would not have oc-

curred to him to ask Mr. Bergeron, where he should get them. Naturally, the place of obtention would not have concerned Mr. Bergeron. While the natural impulse of the contractor would have been to seek and procure them at the cheapest place, without consulting anyone.

"The fact that he directed the dealers to charge the materials to Mr. Bergeron and to send Mr. Bergeron the bills therefor, and that he did this openly and at once as soon as he needed the first materials, for the work—even at the very beginning of his work, for foundation materials, sand, etc., were necessarily first requisites for the erection of a building—is another pertinent indication that he was sincere in his professed understanding that the defendants were to furnish such materials; otherwise, it is improbable that he would have ventured to have Mr. Bergeron so billed, immediately and so openly.

"Whatever may have been the actual verbiage used in making the contract, the court is satisfied that the plaintiff was in good faith and so understood it when he undertook the work and asked Mr. Bergeron where he should go for necessary materials, and immediately so obtained them and unhesitatingly directed that Mr. Bergeron be apprised thereof and billed for the price.

"That he did discuss the matter of new lumber at least with Mr. Bergeron, is attested to by the witness, Sydney Malbrough, a carpenter employed by the plaintiff, who says (page 55, evidence):

" '* * * The discussion was that there wouldn't be enough studs or posts to build the house, so Mr. Bergeron suggested that he use four by fours to make these studs and use two by sixes for those rafters, that that would make him a better and stronger house. So. Mr. Bergeron told Mr. Chiasson to go to the lumber yard and get some and charge it to him, that he would pay for whatever lumber he would need.'

"Again, on page 56, he says:

" 'He told him to go and get whatever he needed to build the house, and that he would pay for it, that he would pay for the lumber to build the house, for the new lumber.'

" 'We were ready to put the rafters on'; 'the lumber was to complete the house'; 'we hadn't put the rafters on and we needed some more studs to put the frame in the house.'

"Again, on page 59 of the evidence, he was asked:

"Question: 'When that conversation took place between Mr. Chiasson and Mr. Bergeron with reference to the rafters, was that at the time when they first needed lumber?'

"Answer: 'We were just about to need lumber.'

"Ques. 'You hadn't used any new lumber on that house before?'

"Ans. 'Not up to that time.'

"Mr. Malbrough is seemingly a truthful and disinterested witness—at least, less interested than plaintiff, Mr. Bergeron, and his wife, or the defendants.

"According to him, there had been no new lumber used up to that moment—it was ordered and obtained thereafter. Yet, the conversation recited by Mr. Malbrough could have conveyed no other implication to Mr. Bergeron, than that the plaintiff expected him (Bergeron) to furnish such new lumber as was needed, at least for posts, studding and rafters. And there is nothing in the record to show that new lumber was needed for any other purpose.

"If it were a fact that plaintiff was to be responsible for new lumber that should be needed, it is hardly possible that Bergeron would not then have reminded him of his contract. That plaintiff took the position indicated by this conversation, is strongly corroborative of his present position that any new material was to be at the expense of Mr. Bergeron. We say Mr. Bergeron, for it is to be remembered that, up to that time, plaintiff's contract was with Mr. Bergeron, not the present defendants. It was not until later, that the daughter and her husband were revealed to plaintiff as the real owners of the property.

"This conversation, coupled with the facts that he was billed for the lumber as soon as it was furnished, must or should have

convinced Mr. Bergeron that plaintiff expected him to assume and pay for these materials—yet he made no protest there against, to plaintiff. True, he did inquire of Mr. Brown of the lumber yard as to why the bill had been sent to him. But Brown was neither party nor privy to the contract with plaintiff. The inquiry did not amount to a protest; if it had, a protest to Brown was not a protest to plaintiff, and could in no way serve as notice to plaintiff that his interpretation of the contract was not in accord with that of Mr. Bergeron. As to its effect upon plaintiff's rights or mental conclusions of the meaning of the contract, Mr. Bergeron's inquiry addressed to Mr. Brown might just as well never have been made. But, as a matter of fact he did not even repudiate his liability to Brown, and thereafter continued to receive other bills of the same nature from Mr. Brown—at no time telling Brown that he was not responsible therefor.

"Although he received those bills promptly and regularly, he, at no time, said anything to plaintiff in protest there against.

"Acting in accord with his professed understanding of the contract, and receiving no word of dissent from Mr. Bergeron, the plaintiff had good reason to take it for granted that he and Mr. Bergeron were in harmony, in interpreting and understanding their verbal agreement. Becoming convinced, if he did, that plaintiff was laboring under the impression that he (Mr. Bergeron) was to pay for the new materials, it was the duty of Mr. Bergeron, within a reasonable time, to acquaint the plaintiff with the fact that he (Bergeron) did not so interpret their agreement. His prolonged silence, knowing plaintiff's understanding, strongly argues acquiescence therein. Whether or not, he so intended or understood, his actions were such as might very well have impressed plaintiff with an attitude of acquiescence.

"His only attempt to bring the matter to plaintiff's attention, consisted in sending his son-in-law, one of the present defendants, to ask about it.

"It must be remembered that this son-in-law was not a party to the contract and, up to that time, had not been disclosed to plaintiff as an interested party; therefore, his query as to why plaintiff had had the lumber charged to Mr. Bergeron was not one to which plaintiff was called upon to accord any special attention—indeed, according to Mr. Clement, the son-in-law, the plaintiff appeared to attach very little importance to the query. To quote the witness (top of pg. 46, evidence), when asked: 'What did you tell him?' Clement replied:

" 'I told him I found it funny that it was charged to Mr. Bergeron, on his name. And he said,—well he just kind of smiled it off and told me to "keep the bill." That is all.'

"Questioned by the court, the witness said that he received the first bill between July 20 up to sometime in August; that he took none of them to plaintiff except the first, though he received every bill that was sent to Mr. Bergeron.

"Though he says that he told Mr. Brown that he had understood that Mr. Bergeron was not liable for the lumber, at the time the first bill was received, he admits that he said nothing further to Brown thereafter. Asked again on page 46, 'Did you tell Mr. Chiasson (plaintiff) anything?' He replied, on page 47:

" 'I just told him that the bill came charged to Mr. Bergeron, on his name, and I asked him what he wanted to do with it and he just told me to keep it.'

"Though extensively questioned concerning this interview with plaintiff, on page 47, he at no time quotes plaintiff as in any way recognizing or admitting any responsibility for the material bills; or that he considered himself as in any way obligated to discuss his contract with any other than Bergeron, with whom his agreement was made. And Bergeron said nothing to him.

"A study of the record suggests the conclusion that, since neither Bergeron nor his son-in-law are educated or business men—nor, indeed, does the plaintiff appear to be —they possibly deemed that they had taken the proper steps to lay the foundation for a refusal to pay the bills. It is entirely possible that they entertained the under-

standing of the contract, which they now assert.

"If that be true, they, or at least Bergeron, should have, upon receipt of the first bill charged to him, immediately raised the question with the plaintiff.

"The fact that the bill was sent to them at the direction of plaintiff was proof apparent that plaintiff was entertaining an altogether different understanding of the building agreement. They should not have contented themselves with merely having Clement ask him why he had done so; and when his response thereto clearly indicated that he was not withdrawing from his attitude that the bill was properly charged to Bergeron, they should have proceeded at once and not with undue delay, to challenge his (as they saw it) erroneous attitude. They should not have, thereafter, adopted and persevered in a course of silence, well calculated to confirm him in his own interpretation of the contract.

"The plaintiff has satisfactorily shown that he was sincere in his own understanding thereof. Granting the same sincerity to Mr. Bergeron, notwithstanding his dilatoriness in challenging plaintiff's understanding thereof, when unmistakably brought to his attention, we would have a situation in which the two contracting parties entertained a toally different conception of the terms and conditions of the contract—especially as regards new lumber that might be needed. If that be true, there never had been a true meeting of the minds of the bargaining parties—consequently, no legal contract.

"There being no definite contract, except that they seem agreed that four hundred dollars was to represent plaintiff's work and time, when Bergeron and defendants discovered that plaintiff was charging the new materials to Bergeron, and permitted him not only to continue the building of the house under his demonstrated erroneous interpretation of the contract, thus failing to halt him while there was yet time to demand and obtain a genuine understanding and agreement, but in addition thereto, permitted the purchasing of new lumber and the charging thereof to Bergeron's account to continue without further and positive protest accompanied by notice that Mr. Bergeron would decline to recognize responsibility therefor, their course must be held to have amounted to an acquiescence, on their part, in the interpretation assumed by the plaintiff. Being well aware of his attitude and interpretation, they knowingly and neglectfully permitted him to continue to employ his time and labor in that belief—that he did so continue, was their fault and at their risk— a word from them would have stopped him and would have provoked a real understanding; failing which, he might not have continued to expend his time at labor to the benefit of defendants.

"That being the situation, both equity and law direct that they must now abide by the interpretation under which he proceeded, with their knowledge and implied assent.

"Aside from the legal merits of the question, the record fairly establishes that the plaintiff lost money on the contract, even if settled with as per his demands. While that fact would be without any weight as against a definitely established contract, in the present instance it is a pertinent collateral fact that lends probability to plaintiff's insistence that he did not and would not have undertaken the contract under the terms now claimed by Mr. Bergeron, and makes it easier to credit him with sincerity when he insists that he expected Mr. Bergeron to furnish the materials, and that he should himself receive four hundred dollars for his time and labor, in addition to the two hundred and sixty dollars, which, it appears to have been taken for granted, would go to the person who attended to the papering and painting job."

The facts and circumstances of the case are fully reviewed by the court in a well-prepared and elaborate opinion. We have carefully read every line of this record, and find that the conclusions below are fully supported by the evidence, and we are unable to find any error in the judgment which would warrant a reversal by this court.